IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 1, 2024

### PATRICK M. MALONE v. JAMES WILLIAM ROSE, ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 19CV-48249      Michael Binkley, Judge**

_____

### No. M2023-01453-COA-WR-CV

_____

This matter concerns prior restraint on speech. Patrick M. Malone ("Father") is a party to an action in the Chancery Court for Williamson County ("the Trial Court") against maternal grandparents James William Rose and Jennie Adams Rose ("Respondents") concerning Father's minor child, Rosie ("the Child"). Father's father, Michael P. Malone ("Petitioner"), testified voluntarily at a hearing on Father's motion to set bail pending appeal of Father's convictions for criminal contempt. In two written orders, the Trial Court ordered Petitioner not to discuss the legal proceedings of Father's case with the Child. Petitioner, a non-party, filed a petition for writ of certiorari in this Court seeking reversal of the Trial Court's orders against him as he contends they were improper. We granted the petition. The Trial Court's restrictions lack an adequate evidentiary basis. In addition, the Trial Court erred in abridging Petitioner's constitutional right to free speech when Petitioner is a non-party who lacked the benefit of notice or a hearing. We reverse the provisions of the Trial Court's orders dated August 15, 2023 and August 17, 2023 restraining Petitioner from discussing the legal proceedings of Father's case with the Child.

**Tenn. Code Ann. § 27-8-101 Petition for Writ of Certiorari;**
**Judgment of the Chancery Court Reversed**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Daniel A. Horwitz, Lindsay Smith, and Melissa Dix, Nashville, Tennessee, for the petitioner, Michael P. Malone.[1]

_____

[1] Father filed notice in this Court that he joins Petitioner's brief. We note that we are addressing only Petitioner's matter in this Opinion. In our order granting the petition for writ of certiorari, we stated that, "[t]o the extent [Father] requests relief in addition to the relief requested in [Petitioner's] petition, such request is denied."

Ashley Goins Alderson and Mary Liz King, Nashville, Tennessee, for the respondents, James William Rose and Jennie Adams Rose.[2]

## OPINION

## Background

In this matter, Petitioner asserts that his right to free speech was unlawfully abridged by the Trial Court. Father and Respondents were engaged in litigation concerning the Child. Petitioner, a non-party, voluntarily testified at the June 9, 2023 hearing on Father's motion to set bail pending appeal of Father's convictions for criminal contempt. During the hearing, the Trial Court ordered Petitioner not to discuss the legal proceedings of Father's case with the Child. The following exchange occurred as the Trial Court addressed Petitioner:

THE COURT: Sir, let me tell you what the law says. This isn't me, Judge Michael Binkley, saying this. This is the law that I need for you to understand so we don't have a problem later on.

You're not going to be a witness in this case, and I understand that. And as a result, you may sit in this courtroom. But I want you to understand, sir, as the grandfather of this child that you are not to discuss with anyone the testimony in this courtroom. Do you understand that, sir?

MR. MICHAEL MALONE: Yes, I do.

THE COURT: You're not to discuss with this child the testimony you hear in this courtroom. Is that understood?

MR. MICHAEL MALONE: Yes, sir.

THE COURT: That is an order of this Court.

Last thing, sir, the last thing. You don't know me, but I'm telling you the truth. The last thing I want to do is hold anyone in contempt. That's the last thing I want to do. And I don't want to do that to you. All you have to do is use your common sense. You don't talk to a young child about adult matters in the courtroom. And that's all I'm asking you to do.

Would you comply with that request, please, sir?

MR. MICHAEL MALONE: Have so far.

THE COURT: Well, will you --

MR. MALONE: Yes.

THE COURT: -- comply with that request?

MR. MICHAEL MALONE: Yes.

---

[2] Respondents' brief incorporates their response to the petition for writ of certiorari.

Later in the hearing, this exchange occurred between the Trial Court and Petitioner:

THE COURT: Stop right there.

How old is Rosie, sir?

THE WITNESS: She'll be 11 in two days.

THE COURT: Do you think it's in a child's best interest for the grandfather to engage with her in adult matters by saying, well, sweetheart, or whatever you say, your daddy's in jail? Do you think that negatively affects her, sir, or do you even think about it?

THE WITNESS: I think about it, but what do I -- she knows he's going to court and she knows he doesn't come back. And when she asks where he is -- she is very mature at 11 years old. She knows what's going on.

THE COURT: Let's get to the answer. My question was very straightforward.

Do you think that type of statement to an 11-year-old child is in her best interest?

THE WITNESS: Yes. I do.

THE COURT: Why don't you just try the truth and let her know why her daddy's in jail. Whoa.

THE WITNESS: I haven't said a word.

THE COURT: You were getting ready to.

THE WITNESS: I didn't say it, though.

THE COURT: Don't play games with me.

THE WITNESS: I'm not playing games with you.

THE COURT: Yes, you are, sir, but that's fine. I'll say just as easy as I can with you, because I want to get your answers. You're under oath here. And I want to get a perspective of what you're thinking.

So you think it's okay to tell this 11-year-old child that her daddy is in jail.

Did you ever think about telling her why? Have you ever done that?

THE WITNESS: I have.

THE COURT: Okay. What did you tell her?

THE WITNESS: I have told Rosie that my thoughts on this are that her grandparents feel that they are, based on things that have happened before in this, that they don't think Pat is an adequate parent, that they think -- initially, they wanted her to go live with their son and daughter in Washington, that they don't think they get to see her as often as they want to.

THE COURT: Why don't you just tell her the truth?  It's his fault for not allowing the grandparents to see Rosie.  Why don't you just tell the truth?  The truth always works --

THE WITNESS: I did.

THE COURT: -- when everything else fails.

So you told Rosie -- you shouldn't be talking to her anyway, in my humble opinion, about adult matters, but you seem to think that's okay.

Are you telling me under oath today that you told Rosie that the reason her father is in jail is because of him and his conduct and no one else?  Did you tell that to her?

THE WITNESS: You didn't let me finish, sir.

THE COURT: Well, answer that question and then I'll let you finish.

THE WITNESS: Yes.

THE COURT: You told her that?

THE WITNESS: Yes.  I said that they filed suit, got visitation, and your dad hasn't complied with the visitation and that's why he's in jail.

THE COURT: Are you sure about that?

THE WITNESS: Yes, I am.  I'm absolutely positive.  And I [semi]-resent being accused of not telling the truth.

THE COURT: Resent it.

THE WITNESS: I resent it.

THE COURT: Well, there are a lot of problems in this case, sir.  All we're trying to do is to get your son, so simple, to get your son to allow this little girl to visit with her grandparents.  It is not rocket science.

When making its findings from the bench, the Trial Court stated in part as follows:

All right.  Here are my findings.  Mr. Malone has proven in this case with the history of his conduct time and time again that he does not respect the orders of this Court.  Time and again Mr. Malone has failed to appear in court despite my very clear and distinct orders about exactly what he needed to do.  Those orders were clear and unambiguous.  They were also lawful orders.

The grandparents are worried and for good reason, in my opinion, based upon Mr. Malone's prior conduct.  He will never come back here.  This is it, that they're going to put the white flag up.  On what?  Just trying to see their granddaughter.  Good reason for them to be afraid.

I agree their concern is valid based upon Mr. Malone's previous history of disrespect for court orders, his disrespect for arguing, his disrespect for just good common decency in allowing the other grandparents to visit

-4-

with their granddaughter is all they're doing. All they're doing is giving her love.

I am troubled greatly by Mr. Malone, who testified here today, about him talking to his granddaughter about why Mr. Malone is in jail. I am troubled. Why does that need to happen? Maybe she is mature, but it still doesn't mean that needs to happen. She's not of sufficient age and maturity emotionally and every other way to really absorb everything when she's just seeing one side of the story from the Malones. It's a shame. It's a shame.

The Trial Court declined to set bail for Father pending appeal, a decision which this Court vacated three days later.

On August 7, 2023, Father moved for the Trial Court to recuse. In the meantime, on August 15, 2023, the Trial Court entered an order which stated as relevant: "It is further ORDERED, ADJUDGED, and DECREED that Paternal Grandfather and Father shall be, and are hereby, prohibited from speaking to the minor child about these legal proceedings, as that topic is an adult issue." On August 17, 2023, a nearly identical order was entered by the Trial Court except this time there was an explanatory footnote stating:

> This Order was lost in the shuffle of appellate filings following the June 9, 2023, hearing in which this Court denied bond. Since the June 9, 2023, hearing, the Court of Appeals entered an Order requiring that bond be set. In compliance with the Court of Appeals' Order, on June 22, 2023, another hearing was held and this Court set bond with strict bond conditions. The Order resulting from the hearing on June 22, 2023, regarding Father's bond remains in effect. This Order from the June 9, 2023, hearing is now being entered for the sake of a complete record, and so there is a written Order reflecting that Father and Paternal Grandfather are under a Court Order not to discuss these proceedings with the child.

In September 2023, the Trial Court denied Father's motion to recuse. In October 2023, Petitioner filed a petition for writ of certiorari in this Court. In November 2023, we granted the petition.

## Discussion

Petitioner raises four issues. Although not stated exactly as such, Petitioner's issues are: (1) whether the Trial Court's *sua sponte* prior restraint orders forbidding Petitioner's speech about what took place in a public judicial proceeding abridge the First Amendment; (2) whether the Trial Court's *sua sponte* prior restraint orders are void for violating Section 1.02 of Tennessee Supreme Court Rule 10B because they were entered while a motion to

recuse was pending; (3) whether the Trial Court's *sua sponte* prior restraint orders are void for lack of jurisdiction; and (4) whether this Court should exercise its certiorari authority to vacate the Trial Court's *sua sponte* prior restraint orders. We discern one dispositive issue, which we restate as follows: whether the Trial Court erred in ordering Petitioner not to discuss the legal proceedings of Father's case with the Child.

This matter reaches us by means of a petition for writ of certiorari. "A writ of certiorari is an order from a superior court to an inferior tribunal to send up a complete record for review, so that the reviewing court can ascertain whether the inferior tribunal has exceeded its jurisdiction or acted illegally, fraudulently, or arbitrarily." *State v. Lane*, 254 S.W.3d 349, 354 (Tenn. 2008). Where a petitioner alleges that the trial court has acted without legal authority and "there is no other plain, speedy, or adequate remedy," a writ of certiorari may be warranted. Tenn. Code Ann. § 27-8-101; *State v. Adler*, 92 S.W.3d 397, 401 (Tenn. 2002), *superseded on other grounds by statute,* Act of May 8, 2003, ch. 175, 2003 Pub. Acts 292 (codified as amended at Tenn. Code Ann. § 40-32-101), *as recognized in State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017).

The present matter concerns prior restraint on speech. This Court has previously discussed prior restraint as follows:

> An impermissible "prior restraint" exists when the exercise of First Amendment rights depends upon prior approval of public officials. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001), *cert. denied* 535 U.S. 1073, 122 S.Ct. 1952, 152 L.Ed.2d 855 (2002). A system creating prior restraints bears a heavy presumption against its constitutional validity. *Id.* (citing *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). In the context of protected speech, " 'prior restraint' is a label used in constitutional law to describe administrative or judicial orders that forbid a communication when issued in advance of the time that the communication is to occur: Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated." 2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 11:24 Injunctions–Prior Restraint Rule (2d ed.). Accordingly, the First Amendment of the United States Constitution, and Article I, Section 19 of the Tennessee Constitution, provide broad protections to prevent the abridgment of a person's right to freedom of speech. These protections require the application of strict scrutiny review when a court is presented with the question of whether a person's fundamental rights, such as freedom of speech, have been infringed. *See generally San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Strict scrutiny requires that the restraint on speech be "narrowly tailored to serve a compelling governmental interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009).

*In re Conservatorship of Turner*, No. M2013-01665-COA-R3-CV, 2014 WL 1901115, at *8 (Tenn. Ct. App. May 9, 2014), *no appl. perm. appeal filed*.

Petitioner argues, among other things, that prior restraints are heavy, onerous infringements of First Amendment rights; that prior restraints are presumptively unconstitutional; and that there was no compelling justification whatsoever for the Trial Court to restrain Petitioner's speech in this instance. Respondents, for their part, assert that free speech is not absolute. They say that certain restrictions on speech are common in domestic relations cases, such as non-disparagement clauses in parenting plans. Respondents concede, however, that they have found no authority authorizing a court to issue such orders to a voluntary, non-party witness like Petitioner. Nevertheless, Respondents cite to Tenn. R. Civ. P. 65.07, which states as pertinent: "In domestic relations cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of this Rule shall be followed only insofar as deemed appropriate by such judge." Respondents contend that the Trial Court's orders restraining Petitioner's speech are in the Child's best interest.

In *Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260 (Tenn. Ct. App. March 29, 2017), *no appl. perm. appeal filed*, a relevant precedent addressing prior restraint on speech in a domestic relations setting, father filed a petition against mother to modify the permanent parenting plan concerning their minor child. *Id*. at *1. The trial court granted father's petition and, as relevant, enjoined mother not to reference father on social media; not to make disparaging remarks about father to the child or others in the child's presence; and not to discuss the custody proceedings or other "adult-only" issues with the child. *Id*. at *5. At the hearing, certain evidence had been presented concerning the effect of mother's communications with the child. *Id*. at *4. Andrea Woodard, the child's school principal, testified that the child had "discussed the fact that Mother had shared details of the custody battle and other sensitive topics" with the child. *Id*. Ms. Woodard said that the child exhibited a "high level of anger" and "physically lashed out against her peers" leading Ms. Woodard to speak to mother about some topics being inappropriate to discuss with children. *Id*. In addition, Tricia Reynolds, a CASA volunteer, stated that "Mother discussed matters with [the child] that were inappropriate and that could have a negative psychological impact on the child." *Id*. In fact, mother's inability to control what she said to the child was Ms. Reynolds' "greatest concern." *Id*. Mother appealed the trial court's judgment, including the speech restrictions, to this Court. *Id*. at *5.

-7-

On appeal, we held as pertinent that "[u]nder these facts, it is entirely proper for the juvenile court to restrict Mother from making disparaging and clearly defamatory remarks about Father online or to the child or in the presence of the child." *Gider*, 2017 WL 1178260, at *12. We stated further that "[i]n light of their adverse effect on [the child], the record also supports restricting Mother's communication to the child about the court proceedings and other topics specifically identified in the order. The demonstrated harm outweighs Mother's free speech rights." *Id*. However, we held that certain of the trial court's restrictions on mother's speech went too far. *Id*. We stated:

[C]ertain of the restrictions placed on Mother's communications were overbroad or vague. The prohibition against any mention of Father by Mother on social media would prohibit even the most benign reference to Father. And the prohibition against Mother discussing "adult-only issues" with her child leaves a reasonable basis for doubt as to what topics, beyond those specifically mentioned in the order, Mother may not discuss. Consequently, we modify the juvenile court's injunction to remove the prohibitions against 1) any reference by Mother to "Father at all on social media" or 2) discussions of "adult-only issues" beyond those topics specifically referenced in the injunction. Our ruling, however, does not preclude the juvenile court from expanding its injunction in the future to cover additional topics provided the restraints on Mother are supported by adequate factual findings and are narrowly tailored to limit the prohibited speech.

*Id*. at *12.

Thus, Respondents are correct so far as it goes that Tennessee law has countenanced, at least in a limited fashion, some restrictions on speech in domestic relations cases involving children. Nevertheless, these restrictions must be narrowly drawn. A number of critical distinctions exist between *Gider*, for example, and the case at bar. In *Gider*, the individual being restrained was the child's mother and a party to the case. Here, Petitioner is a non-party who voluntarily showed up to testify at the hearing. In *Gider*, we emphasized the necessity of adequate factual findings and that the restraints on speech be narrowly tailored to limit the prohibited speech. As Petitioner points out, there was no specific finding of danger to the Child in this case. Instead, the Trial Court appears to have based its decision to restrict Petitioner's speech simply on its subjective view about what children should or should not hear. That will not suffice. A trial court's personal opinion is not a basis for restricting a person's constitutional right to free speech. In *Gider*, the trial court heard evidence that the mother's remarks had an adverse impact on the child. *Gider*, 2017 WL 1178260, at *4. By contrast, here, there is no such evidence or corresponding factual

findings to justify the Trial Court's prior restraint orders against Petitioner discussing the legal proceedings with the Child. Absent any such specific findings, the Trial Court's prior restraint orders are based merely on the Trial Court's subjective beliefs, which cannot outweigh Petitioner's First Amendment rights.

Beyond the lack of evidentiary support or factual findings to support the prior restraints, Petitioner is not even a party to the underlying action. He was a voluntary witness at a hearing on a motion to set bail. Respondents argue that trial courts have wide discretion under Tenn. R. Civ. P. 65.07 to issue injunctions. In response, Petitioner points out that Rule 65.07 contemplates injunctions issued upon application. No application was made here; the Trial Court just decided on its own that Petitioner, a non-party, should not talk to the Child about the legal proceedings including telling the Child where her father was. Petitioner lacked any notice or meaningful opportunity to respond. Crucially, he also lacked the benefit of a hearing. Despite these circumstances, the Trial Court entered orders restraining Petitioner's speech, one of the most serious actions a court can take. It is little wonder that Respondents concede they have found no authority for such a proposition. Rule 65.07 is of no avail to Respondents here, and the Trial Court's prior restraint orders do not pass constitutional muster. We conclude that the Trial Court erred in restraining Petitioner from talking to the Child about the legal proceedings. Petitioner's other issues are pretermitted. We reverse the provisions in the Trial Court's orders dated August 15, 2023 and August 17, 2023 restraining Petitioner's speech.

## Conclusion

The provisions in the Trial Court's orders dated August 15, 2023 and August 17, 2023 restraining Petitioner's speech are reversed. A copy of this Opinion and accompanying Judgment shall be transmitted by this Court's Clerk to the Trial Court. Costs are assessed against the Respondents, James William Rose and Jennie Adams Rose.

_____
D. MICHAEL SWINEY, CHIEF JUDGE